

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Jacinto López Borges<br><br>Recurrido<br><br>v.<br><br>Administración de Corrección<br><br>Peticionario | Certiorari<br><br>2012 TSPR 90<br><br>185 DPR \_\_\_\_ |

Número del Caso: CC-2010-611

Fecha: 24 de mayo de 2012

Tribunal de Apelaciones:

      Región Judicial de Guayama

Oficina del Procurador General:

      Lcda. Zaira Z. Girón Anadón
      Subprocuradora General

      Lcda. Sylvia Roger Stefani
      Procuradora General Auxiliar

Abogado de la Parte Recurrida:

      Lcdo. Pedro J. Reyero

Materia: Derecho Administrativo – Ley del Mandato Constitucional de Rehabilitación de 2004: Reclasificación de custodia

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Jacinto López Borges
        Recurrido


        v.
                                CC-2010-611        *Certiorari*

Administración de Corrección
        Peticionario



Opinión del Tribunal emitida por la Jueza Asociada señora FIOL MATTA



San Juan, Puerto Rico, a 24 de mayo de 2012.


El confinado Jacinto López Borges tiene 47 años de edad. Los últimos 21 años de su vida ha estado encarcelado en una prisión de máxima seguridad por haber robado dos veces cuando tenía 19 años y otra vez cuando tenía 26 años, lo que conllevó que lo declararan reincidente habitual y, por consiguiente, lo sentenciaran a separación permanente de la

sociedad.[1] Durante su tiempo en la cárcel, recibió tratamiento para su adicción a sustancias controladas y se certificó que ya no necesita atención para esa enfermedad. Asimismo, estando en prisión, terminó su grado de cuarto año de escuela superior y completó los talleres de crecimiento personal y las terapias psicológicas Aprendiendo a Vivir Sin Violencia. También está trabajando en el área de Empaque de la institución, a pesar de que no recibe bonificaciones por ello. El señor López Borges no tiene querellas disciplinarias y, en su evaluación de reclasificación de custodia, recibió una puntuación objetiva que le hubiese permitido permanecer en una cárcel de seguridad mínima, por no haber presentado problemas de conducta en el sistema correccional.

Con este cuadro, el confinado era acreedor de una reducción en su nivel de custodia. No obstante, el Departamento de Corrección decidió ratificar su nivel de custodia en máxima, basándose en una disposición derogada sobre reincidencia habitual del Código Penal de 1974 y violando lo establecido en la Ley de Mandato Constitucional

---

[1] El artículo 62 del Código Penal de 1974, vigente cuando se sentenció al señor López Borges, disponía que los reincidentes habituales serían sentenciados a separación permanente de la sociedad y cumplirían toda su sentencia en una cárcel de seguridad máxima. 33 L.P.R.A. sec. 3302 (derogada). El Código Penal de 2004, en su artículo 81, cambió la pena para reincidentes habituales a un término de 99 años y eliminó la disposición sobre el nivel de custodia en la prisión. 33 L.P.R.A. sec. 4709(c).

de Rehabilitación de 2004. El Tribunal de Apelaciones revocó esa determinación, porque no se puede negar una reclasificación de custodia utilizando la categoría de reincidente habitual como único fundamento. Confirmamos la decisión del foro apelativo.

I

La Ley de Mandato Constitucional de Rehabilitación, Ley 377 de 2004, declara como política pública del Gobierno de Puerto Rico la rehabilitación del delincuente.[2] Dispone que la aspiración consignada en la Sección 19 del Artículo VI de la Constitución del Estado Libre Asociado, al ordenar que las instituciones penales promuevan la rehabilitación moral y social de los delincuentes, constituye un mandato del Pueblo, a partir de la vigencia de esa ley.[3] Este estatuto no hace distinciones en cuanto a cuáles confinados beneficia; siempre se refiere a "toda la población penal".[4] El historial legislativo de la medida demuestra que la catalogación de reincidente habitual nunca se consideró como

---

[2] Art. 2, Ley de Mandato Constitucional de Rehabilitación, Ley Núm. 377-2004.

[3] Exposición de Motivos, Ley Núm. 377-2004. La Exposición de Motivos cita, además, la discusión de la Convención Constituyente al aprobar esta disposición. En ésta se resalta que el fin último de la rehabilitación de los reclusos es garantizarle a la ciudadanía que las personas que salen de la cárcel han sido rehabilitadas, ya no son una amenaza a la seguridad de los demás y serán útiles a la sociedad en la que van a convivir.

[4] Exposición de Motivos, Art. 3, Art. 5 y Art. 6, Ley Núm. 377-2004.

una limitación para que un confinado se sirviese de todos los beneficios del sistema de rehabilitación, incluyendo la reclasificación de custodia.[5]

Así, el artículo 3 de la Ley 377 ordena, a la Administración de Corrección y a todos los organismos relacionados con el sistema correccional, implementar programas de rehabilitación "que impacten a <u>toda la población sentenciada</u>" y enumera exigencias específicas con las que tienen que cumplir como parte de esa obligación.[6] La primera de éstas consiste en la "<u>[c]lasificación adecuada</u> de la población correccional y <u>revisión continua</u> de esta clasificación conforme a los ajustes y cambios de la clientela".[7]

II

La clasificación de los reclusos en distintos niveles de custodia es, según el Manual de Clasificación de Confinados de la Administración de Corrección del 2000 vigente, la médula de un sistema correccional eficaz. Esa clasificación consiste en "la separación sistemática y <u>evolutiva</u> de los confinados en subgrupos, en virtud de las

---

[5] *Véase* Comisión de lo Jurídico del Senado, Informe sobre el Sustitutivo del P. del S. 1731, 17 de marzo de 2004.

[6] (Énfasis suplido.) Art. 3, Ley Núm. 377-2004, 4 L.P.R.A. sec. 1611.

[7] (Énfasis suplido.) Art. 3, Ley Núm. 377-2004, 4 L.P.R.A. sec. 1611 (a).

necesidades de cada individuo […], que continúa desde la fecha de ingreso del confinado hasta la fecha de su excarcelación".[8] Para ello, se hace una clasificación inicial y, luego, reclasificaciones periódicas. El propósito de la reclasificación es determinar cuán apropiada es la asignación de custodia de la persona en ese momento, según su proceso de adaptación y su plan de rehabilitación.[9]

La importancia de la reducción del nivel de custodia, como parte del proceso de rehabilitación, se refleja en la regla que enuncia constantemente el Manual de Clasificación del 2000: se tiene que ubicar a cada confinado en el nivel de custodia menos restrictivo posible.[10] Esto garantiza que personas con necesidades y rasgos de personalidad parecidos tengan niveles de custodia similares[11] y es lo que hace del sistema de clasificación uno funcional.[12] Con el propósito

---

[8] (Énfasis suplido.) Perspectiva General, Reglamento Núm. 6067 de la Administración de Corrección, Manual de Clasificación de Confinados de 2000 [Manual 2000], aprobado 23 de diciembre de 1999, pág. 1; Exposición de Política, Manual 2000, pág. 2; Clasificación, Manual 2000, Sección 2, Parte II. A. 2, pág. 11.

[9] Objetivos de la reclasificación de custodia, Manual 2000, Sección 7, Partes I y II, pág. 39.

[10] Perspectiva General, Manual 2000, pág. 1; Exposición de Política, Manual 2000, Sección 1, Parte III. A, pág. 2; Objetivos del sistema de clasificación, Manual 2000, Sección 2, Parte II. A. 2, pág. 11.

[11] Objetivos del sistema de clasificación, Manual 2000, Sección 2, Parte II. A. 1, pág. 11.

[12] Perspectiva General, Manual 2000, pág. 1.

de que cada preso socialice con reos que se encuentren en su mismo nivel de readaptación moral y no se perjudique su progreso, el Manual ordena revisar la clasificación de todos los confinados asignados a custodia máxima cada 6 meses; las clasificaciones de mínima y mediana se revisan anualmente.[13] Así, mientras más restrictivo es el nivel de seguridad asignado, con mayor frecuencia se hace la evaluación de reclasificación para determinar si la conducta del recluso amerita una reducción de custodia.

Además, el Manual reconoce que "[e]s importante que los confinados con sentencias prolongadas tengan la oportunidad de obtener niveles de custodia reducida".[14] Esa reducción está condicionada al cumplimiento del reo con los requisitos de su plan institucional, que va evolucionando durante el encarcelamiento de acuerdo con el aprovechamiento del proceso de rehabilitación por parte del confinado. Por eso, la evaluación para reclasificación, aunque se parece a la evaluación inicial de custodia, "recalca aún más la conducta institucional como reflejo del comportamiento real del confinado durante su reclusión".[15] No sólo se le da más

---

[13] Definición de reclasificación, Manual 2000, Sección 1, pág. 8; Programa para la revisión de custodia, Manual 2000, Sección 2, Parte V. D, pág. 17; Tipos de reclasificación, Manual 2000, Sección 7, Parte III. B, pág. 39.

[14] Objetivos de la reclasificación de custodia, Manual 2000, Sección 7, Parte II, pág. 39.

[15] (Énfasis suplido.) *Íd.*

peso a la conducta que ha observado el recluso durante el confinamiento, sino que, incluso, no se considera la mala conducta dentro de la prisión que se haya dado mucho tiempo atrás, como son los motines y las fugas en periodos remotos. Es así porque, si sólo se evaluara la conducta por la que está presa la persona o se le diera mayor importancia a las características de su sentencia, no tendría sentido alguno la revisión periódica del nivel de custodia, pues el resultado del análisis siempre sería el mismo.

El Formulario de Reclasificación de Custodia se utiliza "para actualizar y revisar la evaluación inicial de custodia".[16] Mientras más alta es la puntuación en la escala, mayor es el nivel de custodia que necesita el confinado. En el caso del señor López Borges, la puntuación objetiva final fue de 1, que permite un nivel de custodia mínima. Para obtener este número, se tomó en cuenta la gravedad de los cargos y condenas actuales, que recibió 4 puntos.[17] A eso se le restaron 2 puntos en consideración de la edad del confinado y 1 punto por su participación en programas desde la última clasificación. Los renglones que podrían haber aumentado el número final, para arrojar que se debía mantener la clasificación de máxima, recibieron

---

[16] (Énfasis suplido.) Objetivos de la reclasificación de custodia, Manual 2000, Sección 7, Parte II, pág. 39.

[17] Un confinado se clasifica en el nivel de máxima cuando tiene una puntuación mayor de 7 en este renglón.

puntuación de 0: historial de fuga en los últimos cinco años, condenas disciplinarias y condenas previas de delitos graves en los últimos cinco años.[18] Esa evaluación manifiesta que, a pesar de que la clasificación de la conducta por la cual está cumpliendo el recluso es grave, la adaptación que ha demostrado en prisión lo hace acreedor de un nivel de custodia menos restrictivo que el inicial.

Por otro lado, el señor López Borges ha estado encarcelado desde el 1991. El Manual de Clasificación de Confinados establece que, independientemente de cualquier otra disposición de ese reglamento y de la puntuación final en la escala, a una persona que haya estado encarcelada continuamente desde antes de mayo de 1996 no se le aumentará el nivel de custodia, a menos que haya sido encontrado culpable de violaciones disciplinarias o delitos después de esa fecha. La única excepción a esta regla responde a casos extraordinarios en los que la conducta del confinado represente un peligro apremiante para la seguridad del personal, del público y de los demás confinados.[19] Esta norma refleja la intención de no castigar con niveles de

---

[18] Escala de Clasificación de Custodia, Jacinto López Borges, 8 de diciembre de 2008, Apéndice del Certiorari, pág. 84.

[19] Disposición Especial para Confinados Encarcelados Continuamente antes de 1996, Manual 2000, Sección 6, Parte V, pág. 37; Sección 7, Parte V, pág. 46.

custodia altos a reclusos con sentencias prolongadas que mantengan buena conducta en la institución penal.

Si bien es cierto que la reducción del nivel de custodia no es el único fin de la reevaluación de custodia, cuando el análisis del expediente arroja que el confinado merece un nivel de custodia menor, no se puede negar la reducción utilizando el argumento de que la reevaluación hubiese podido resultar en medidas diferentes, como la participación en programas de adiestramiento o contra la adicción. Esto, menos aun cuando el confinado ya ha completado todos los programas y el próximo paso para su rehabilitación tiene que ser la reducción de custodia. De igual manera, el que el Manual haga la salvedad de que el proceso de reevaluación no siempre conlleva un cambio de custodia no significa que se puede ratificar la custodia actual aunque las circunstancias exijan lo contrario.[20]

En *Cruz v. Administración*, advertimos que tomar en consideración únicamente un factor de la condena al momento de reclasificar al confinado, por ejemplo, la extensión de la sentencia, constituye un claro abuso de discreción por parte de Corrección.[21] En el presente caso, la modificación

---

[20] Objetivos de la reclasificación de custodia, Manual 2000, Sección 7, Parte II, pág. 39.

[21] Cruz v. Administración, 164 D.P.R. 341, 358-359 (2005). En ese caso, el confinado solicitaba que se redujera su nivel de custodia de máxima a mediana. El Tribunal confirmó

que se le hizo a la evaluación de reclasificación del señor López Borges consistió en anotar que era reincidente habitual. Entonces, su custodia se mantuvo en máxima automáticamente.[22] La clasificación de reincidente fue el único factor que se consideró para esta determinación. Se descartaron los demás elementos que se evalúan en la reclasificación, que responden al proceso de rehabilitación del recluso.

## III

La determinación de la Administración de Corrección ignora el significado y el propósito del proceso de rehabilitación, que es el fin primordial de nuestro sistema correccional por mandato constitucional. La rehabilitación es un proceso largo y complejo que busca transformar la conducta y las actitudes de un ser humano. Como señala la declaración de política pública de la Ley 377, la

---

la determinación administrativa de mantener la custodia en máxima porque la decisión respondió a diversos factores, que

incluyeron la gravedad de los delitos cometidos, entre los que estaba asesinato en primer grado; la proporcionalidad entre los 16 años de reclusión cumplidos y la sentencia de cuatro términos consecutivos de 99 años de prisión, y que no había cumplido con su plan institucional, pues se ausentaba a sus clases y tenía una querella pendiente por posesión de una jeringuilla.

[22] Escala de Clasificación de Custodia, Jacinto López Borges, 8 de diciembre de 2008, Apéndice del Certiorari, pág. 85.

rehabilitación "es el objetivo del ingreso en el sistema de supervisión y custodia; no una alternativa al mismo. La simple existencia de programas y proyectos de actividad y desarrollo educativo, social y cultural o vocacional no constituye la rehabilitación, sino herramientas dentro del proceso".[23] No se pueden confundir las oportunidades de recreación con el proceso, más abarcador y serio, de la rehabilitación moral y social.

El nivel de custodia máxima está reservado para los confinados que requieren un grado alto de control y supervisión. Por razones de seguridad, se les restringen las áreas en las que pueden moverse y las tareas que pueden realizar. Asimismo, se les ubica en celdas individuales y se les requiere utilizar esposas, cadenas y grillete en todo momento cuando salen del complejo correccional a recibir atención médica. Dadas las restricciones que necesita este tipo de población, los programas a los que pueden tener acceso son limitados. A través de los ajustes en la conducta que demuestran los confinados de custodia máxima, logran que se les reclasifique a custodia mediana. En el nivel de mediana, la supervisión es menor, porque los controles internos de la persona le permiten convivir con otros reclusos de la misma clasificación. Los confinados de

---

[23] Art. 3, Ley Núm. 377-2004, según enmendado por la Ley Núm. 165-2009, 4 L.P.R.A. sec. 1611.

mediana se ubican en dormitorios y son elegibles para distintos tipos de labores y actividades que requieren supervisión de rutina. De otro lado, en la clasificación de mínima, los reos pueden participar en programas de actividades y trabajo en la comunidad, con menos vigilancia.[24] Esa evolución en cuanto al grado de supervisión y a las posibilidades de ser elegibles para programas que propendan a la rehabilitación se debe a que la persona tiene que acercarse cada vez más a lo que sería un ciudadano en la libre comunidad. En este caso, el señor López Borges, según la evaluación objetiva, está listo para la custodia mínima, pero, ya que actualmente se encuentra en máxima, está solicitando que se le reduzca su custodia al próximo nivel, que es el de mediana. Entendemos que esa es la clasificación adecuada para sus circunstancias y su progreso con su plan institucional.

La determinación de custodia máxima en casos como el del señor López Borges se basa solamente en una disposición del Código Penal derogado.[25] De hecho, donde único se menciona la reincidencia habitual en el Manual de

---

[24] Definición de Niveles de Custodia, Manual 2000, Sección 1, págs. 6-7. *Véase también* Apéndice del Certiorari, págs. 104-105.

[25] Ese fue el único fundamento que utilizó la Administración de Corrección cuando el señor López Borges pidió reconsideración de la determinación de mantenerlo en custodia máxima. *Véase* Sentencia del Tribunal de Apelaciones, pág. 19.

Clasificación de Confinados del 2000 es en la sección de Definiciones y sólo señala que el Código Penal de 1974, en su artículo 62, "dispone que un convicto que ha sido declarado delincuente habitual será ingresado o trasladado a una institución de máxima seguridad".[26] Esta referencia a la norma que estaba vigente cuando se hizo el Manual, antes de la revisión integral de nuestro ordenamiento penal, que culminó en el 2004, no tiene el carácter de una prohibición absoluta, pues tiene que atemperarse a las enmiendas que ha sufrido la legislación en ese campo. En ese sentido, la ley especial posterior sobre el Mandato Constitucional de Rehabilitación permitió cruzar la barrera del artículo 62 del Código Penal de 1974 y <u>clasificar a todo confinado, incluyendo a quienes están en la categoría de reincidentes habituales, según les corresponda, de acuerdo con su cumplimiento con su proceso de rehabilitación.</u>

La Ley 377 no limita las posibilidades de los reincidentes habituales. Al contrario, reconoce que éstos, además de ser parte de la población penal a la que está dirigida la legislación, tienen necesidades específicas que no se han atendido en décadas anteriores. La Exposición de Motivos de la Ley 377 indica que:

---

[26] Definición de Artículos sobre Reincidencia, Manual 2000, Sección 1, pág. 3.

Ante el auge de la acción delictiva y la creciente manifestación de conducta violenta en jóvenes y adultos, desde hace años se ha reclamado examinar la política pública y la acción del Gobierno en materia correccional. Estudios recientes, recomendaciones de Comisiones Especiales, datos empíricos y el juicio de peritos en sociología y criminología han planteado la necesidad urgente de transformar la política correccional como componente fundamental de un sistema de justicia criminal que también ha fracasado estrepitosamente. No puede soslayarse por más tiempo que las estrategias implantadas en Puerto Rico desde el 1974 hasta el presente, en lugar de prevenir o reprimir la comisión de delitos, parecen reproducir o fomentar la criminalidad.

[…]

(e) La reincidencia en la actividad delictiva de los egresados de las instituciones carcelarias y de los programas comunitarios vigentes indican el fracaso de la prisión como institución que busca la rehabilitación.

(f) <u>Para prevenir [la] reincidencia es necesario ampliar los programas dirigidos a preparar al sentenciado para su reinserción a la sociedad y hacerlos disponibles a toda la población penal.</u>[27]

Los reincidentes habituales son, en parte, el producto de ese sistema correccional fracasado que devolvió delincuentes a la sociedad sin haberlos rehabilitado. A pesar del reconocimiento expreso de esa falla del sistema penal retributivo que hizo la Legislatura en el 2004, la Administración de Corrección continúa atendiendo solicitudes como la del señor López Borges a base de la política penal

---

[27] Exposición de Motivos, Ley Núm. 377-2004.

desarrollada hace más de tres décadas, que creíamos superada con las leyes vigentes. Con ello, le impiden a ciertos miembros de la población penal beneficiarse de la nueva política de rehabilitación, porque no fueron rehabilitados bajo el sistema anterior y reincidieron.

IV

Debido a que la Ley de Mandato Constitucional de Rehabilitación no excluye a los reincidentes habituales, pues está dirigida a toda la población penal, y a que la reducción de custodia es un elemento esencial en el proceso de rehabilitación de aquellos confinados que la ameritan, se confirma la Sentencia del Tribunal de Apelaciones y se ordena a la Administración de Corrección realizar una nueva evaluación de reclasificación que no esté limitada por los artículos sobre reincidencia habitual del Código Penal de 1974.

Se dictará sentencia de conformidad.


                                        Liana Fiol Matta
                                         Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Jacinto López Borges
    Recurrido

                                        *Certiorari*

        v.                  CC-2010-611

Administración de Corrección
        Peticionario


                    *SENTENCIA*


En San Juan, Puerto Rico a 24 de mayo de 2012.

        Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, se confirma la Sentencia del Tribunal de Apelaciones y se ordena a la Administración de Corrección realizar una nueva evaluación de reclasificación que no esté limitada por los artículos sobre reincidencia habitual del Código Penal de 1974.

        Lo acordó y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez emitió una Opinión de conformidad. El Juez Asociado señor Martínez Torres emitió una Opinión disidente a la cual se unen la Jueza Asociada señora Pabón Charneco y los Jueces Asociados señores Rivera García y Feliberti Cintrón.


                    Aida Ileana Oquendo Graulau
                    Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Jacinto López Borges<br><br>Recurrido<br><br>v.<br><br>Administración de Corrección<br><br>Peticionario | CC-2010-0611 |

Opinión de conformidad emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 24 de mayo de 2012

Estoy conforme con el resultado al que llega hoy una mayoría de este Tribunal al concluir que la Ley de Mandato Constitucional de Rehabilitación de 2004, Ley Núm. 115 de 22 de julio de 2004, 4. L.P.R.A. secs. 1611 *et seq.* (en adelante Ley de Rehabilitación), tuvo el efecto de enmendar tácitamente el artículo 62 del Código Penal de 1974 (en adelante Código de 1974), el cual prescribía que toda persona condenada como reincidente habitual debía ser sentenciada a la pena de separación permanente de la sociedad mediante reclusión en una institución especializada de custodia máxima durante la totalidad del término impuesto. Sin embargo, escribo por separado por entender que es necesario que expresemos las razones por las que la Ley de Rehabilitación es de aplicación al caso de autos

I

Los hechos que dan origen a la controversia ante nuestra consideración no están en disputa. El señor Jacinto López Borges fue hallado culpable de violar el artículo 173 del Código Penal de 1974 (robo) y el artículo 4 de la Ley de Armas de 1951. El 4 de junio de 1991, la Sala de San Juan del Tribunal de Primera Instancia lo declaró delincuente habitual y, como tal, lo sentenció a la separación permanente de la sociedad mediante reclusión perpetua en una institución especializada de custodia máxima, obedeciendo el mandato inequívoco establecido en el inciso (c) del artículo 62 del entonces vigente Código de 1974.

Durante su tiempo en prisión, ha recibido tratamiento contra la adicción, terminó el cuarto año de escuela superior y ha trabajado en el área de empaque. No se han presentado querellas ni celebrado vistas disciplinarias en su contra.

El 10 de diciembre de 2008, el Comité de Clasificación y Tratamiento del Anexo 296 de Guayama (en adelante el Comité) evaluó la custodia del señor López y, como en múltiples ocasiones anteriores, ratificó su clasificación de custodia como *máxima*. Inconforme con dicha determinación, el confinado presentó una apelación administrativa ante la Supervisora de la Oficina de Clasificación, la cual fue denegada el 19 de diciembre del mismo año bajo el siguiente fundamento:

> [E]l Código Penal del Estado Libre Asociado de Puerto Rico, de 1974, Artículo 62 (Efectos de Reincidencia), Ley 115 del 22 de julio de 1974, según enmendada por la Ley Núm. 101 del 4 de junio

de 1980, Ley 34 del 31 de mayo de 1988 y la Ley
Núm. 32 del 27 de julio de 1993, establece que un
convicto delincuente habitual sentenciado a
reclusión perpetua, deberá cumplir todo su término
de reclusión en institución especializada de
máxima seguridad.

Aún inconforme, el señor López Borges acudió oportunamente al Tribunal de Apelaciones. Allí planteó que, a partir de la entrada en vigor de la Ley de Rehabilitación, la Administración de Corrección ya no estaba obligada a mantener en custodia máxima a las personas sentenciadas a separación permanente de la sociedad por haber sido declaradas reincidentes habituales.

Por su parte, la Administración de Corrección compareció ante el foro apelativo intermedio, mas no se expresó en torno a la alegación presentada por señor López Borges. En cambio, sostuvo que, por virtud de la cláusula de reserva adoptada mediante el artículo 308 del Código de 2004, 33 L.P.R.A. sec. 4935, la Administración de Corrección seguía obligada a mantener bajo custodia máxima a toda persona sentenciada como reincidente habitual bajo el Código de 1974. Además, adujo que, conforme a lo resuelto por este Tribunal en *Cruz v. Administración*, 164 D.P.R. 341 (2005),[28] al momento de evaluar la clasificación

---

[28] Tal y como hiciera el Tribunal de Apelaciones, advertimos que en *Cruz v. Administración*, 164 D.P.R. 341 (2005), no estuvo en controversia el alcance de la Ley del Mandato Constitucional de Rehabilitación en cuanto a los criterios aplicables a la reclasificación de custodia de sentenciados a separación permanente por razón de haber sido declarados

delincuentes habituales, ni la aplicabilidad del artículo 62(c) del derogado Código Penal de 1974 a dichos procesos.

de custodia del confinado, la Administración de Corrección no tomó como único factor concluyente la longevidad de la sentencia impuesta, sino que también consideró que el confinado había sido declarado delincuente habitual y los daños cometidos por éste.

El 14 de mayo de 2010, un panel dividido del Tribunal Apelaciones resolvió que la Ley de Rehabilitación aplicaba a todos los confinados, incluso a aquellos que fueron condenados antes de la aprobación del estatuto.[29] Concluyó que la ley bajo análisis era clara y que no disponía excepción alguna al mecanismo de revaluación de custodia de los confinados. Por tanto, devolvió el caso al Comité para que revaluara el nivel de custodia al que era acreedor el señor López sin tomar en consideración la prohibición impuesta por el artículo 62(c) del Código de 1974.

El 12 de julio de 2010, la Administración de Corrección presentó ante este Tribunal un recurso de *certiorari*, el cual acogimos el 12 de enero de 2011. En este recurso plantea que el Tribunal de Apelaciones erró al aplicar la Ley de Rehabilitación a una persona declarada reincidente habitual bajo el Código de 1974. Sostiene, entre otras cosas, que el foro apelativo intermedio aplicó erróneamente el principio de favorabilidad que recoge el artículo 9 del Código de 2004, 33 L.P.R.A. sec. 288. No le asiste la razón. Veamos por qué.

---

[29] El juez Escribano Medina emitió el voto disidente.

## II

## A

La Sección 19 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico dispone que será política pública del Estado reglamentar las instituciones penales para que sirvan a sus propósitos en forma efectiva y propender, dentro de los recursos disponibles, al tratamiento adecuado de los delincuentes para hacer posible su rehabilitación moral y social.

En cumplimiento con este mandato constitucional, la Ley Habilitadora de la Administración de Corrección, Ley Núm. 116 de 22 de julio de 1974, según enmendada, 4 L.P.R.A. sec. 1101 *et seq.*, facultó a dicho organismo administrativo para estructurar su política pública y para formular la reglamentación interna para los programas de diagnóstico, clasificación, tratamiento y rehabilitación de la población correccional. *Véanse* 4 L.P.R.A. sec. 1112; *López Leyro v. E.L.A.*, 173 D.P.R. 15 (2008); *Cruz v. Administración*, 164 D.P.R. 341 (2005). De esta forma, se le delegó a la Administración de Corrección la facultad de clasificar el nivel de custodia de los confinados de las instituciones correccionales del País.

En atención a esta facultad, la Administración de Corrección ha adoptado diversos reglamentos: el Manual de Reglas para Crear y Definir Funciones del Comité de Clasificación y Tratamiento en las Instituciones Penales, de 27 de febrero de 1979 (en adelante Reglamento de 1979); el

Manual de Clasificación de Confinados, Reglamento Núm. 6067 de 22 de enero de 2000 (en adelante Reglamento de 2000); el Manual para Crear y Definir Funciones del Comité de Clasificación y Tratamiento de las Instituciones Correccionales, Reglamento Núm. 7334 de 10 de abril de 2007 (en adelante Reglamento de 2007).[30] Estos reglamentos delimitan la discreción que ostenta la Administración de Corrección en relación con la clasificación de custodia de los confinados. *Véase Cruz*, 164 D.P.R. 341.

El Comité de Clasificación y Tratamiento en las Instituciones Penales fue creado por virtud del Reglamento de 1979. Su función básica es evaluar las necesidades, capacidades, intereses, limitaciones y funcionamiento social de los confinados; establecer un plan de tratamiento, el cual deberá ser evaluado periódicamente; y realizar aquellos cambios necesarios para el logro de las metas rehabilitadoras y de protección social. Conforme a la Regla 6(b)(2)(a) del precitado Reglamento, los cambios de custodia caen bajo la jurisdicción de este Comité.

Por otra parte, el Reglamento de 2000 dispone, en su sección sobre Perspectiva General, que la clasificación de confinados es la médula de una administración eficiente y

---

[30] Aunque la Administración de Corrección ha aprobado dos (2) manuales de clasificación luego del Reglamento de 2000, ninguno está vigente actualmente. El Reglamento Núm. 7062 de 30 de noviembre de 2005 y el Reglamento Núm. 7295 de 14 de febrero de 2007 se encuentran inactivos tras una orden del Tribunal de Distrito Federal para el Distrito de Puerto Rico en el caso *Morales Feliciano v. Fortuño Burset*, Civil No. 79-0004. Por su parte, el Reglamento de 2007 dejó sin efecto el promulgado en 1979.

eficaz del sistema correccional. *López Leyro*, 173 D.P.R. 15, 30. La clasificación de los confinados en distintos niveles de seguridad consiste en la separación sistemática y evolutiva de los confinados en subgrupos, en virtud de las necesidades de cada individuo y las exigencias y necesidades de la sociedad. El proceso comienza desde la fecha de ingreso del confinado hasta la fecha de su excarcelación. De esta forma, además de satisfacer las necesidades del confinado, el proceso de clasificación también coordina la custodia física de los confinados con los programas y recursos disponibles dentro del sistema correccional. Por último, el proceso responde a principios de protección social, dado que los confinados más peligrosos se mantienen bajo mayores controles de seguridad. *Id*.

La determinación del nivel de custodia de un confinado requiere que la agencia realice un adecuado balance de intereses. En *Cruz v. Administración*, 164 D.P.R. 341, este Tribunal describió ese balance de la siguiente manera:

> Por una parte, estará el interés público de lograr la rehabilitación del confinado, así como el de mantener la seguridad institucional y general del resto de la población penal; de la otra, estará el interés particular del confinado de permanecer en un determinado nivel de custodia.

*Id.* en la pág. 352.

Conforme a estos principios, los acuerdos del Comité de Clasificación y Tratamiento deberán estar fundamentados por hechos e información sometida ante su consideración, mediante la cual se evidencie la necesidad de la acción recomendada o aprobada. Regla 2 del Reglamento de 2007. Sus

decisiones incluirán determinaciones de hechos y conclusiones de derecho, especialmente en aquellos casos en que se evalúe el nivel de custodia de confinados bajo custodia mediana o máxima, ya sea para subirla o ratificarla. Regla 3 del Reglamento de 2007. La jurisdicción del Comité incluye, entre otros aspectos, la administración de: tipo de custodia; alojamientos; trabajo, estudios o adiestramientos vocacional y tratamientos de condiciones especializadas. Regla 4(A) del Reglamento de 2007.

El Comité revisará anualmente los niveles de custodia para los confinados de custodia mínima y mediana. Sección 2(V)(D) del Reglamento de 2000. El nivel de custodia de los confinados clasificados en custodia máxima se revisará cada seis (6) meses, después de un (1) año de clasificación como confinado de custodia máxima.

No obstante, la revaluación de custodia no necesariamente tendrá como resultado un cambio en la clasificación de custodia o en la vivienda asignada. Sección 7(II) del Reglamento de 2000. La función principal de la revaluación de custodia es supervisar la adaptación del confinado y prestarle atención a cualquier situación pertinente que pueda surgir, así como evaluar la conducta real del confinado durante su reclusión.

Las revisiones de clasificación pueden ser de tres (3) tipos: (1) revisiones de rutina, (2) revisiones automáticas no rutinarias y (3) solicitudes de reclasificación

presentadas por los confinados. Sección 7(III)(B) del Reglamento de 2000.

**B**

El Código Penal de 1974, Ley Núm. 115 de 22 de julio de 1974, al igual que el Código vigente, establecía tres (3) tipos de reincidencia para las personas condenadas en más de una ocasión: reincidencia simple, reincidencia agravada y reincidencia habitual.

El inciso (a)(3) del artículo 61 de dicho Código, 33 L.P.R.A. sec. 3301, leía de la siguiente manera:

> Habrá reincidencia habitual cuando el que ha sido convicto y sentenciado por dos o más delitos graves cometidos en tiempos diversos e independientes unos de otros cometiere posteriormente cualquiera de los siguientes delitos o sus tentativas: asesinato, robo, incesto, extorsión, violación, sodomía, actos lascivos o impúdicos cuando la víctima fuere menor de catorce (14) años, secuestro, agresión agravada en su modalidad grave, escalamiento agravado, apropiación ilegal agravada de vehículos de motor o sus partes, incendio agravado, sabotaje de servicios públicos esenciales, fuga cuando la persona esté cumpliendo una sentencia firme o en trámite de apelación por un delito grave, cualquier delito grave en violación a la Ley de Explosivos de Puerto Rico, Ley Núm. 134 de 28 de junio de 1969, y a la Ley Contra el Crimen Organizado, Ley Núm. 33 de 13 de junio de 1978, 25 L.P.R.A. sec. 971 *et seq.*, violación a los artículos 401, 405 y 411(a) de la Ley de Sustancias Controladas de Puerto Rico, Ley Núm. 4 de 23 de junio de 1971, o a los artículos 5 y 8(a) de la Ley de Armas de Puerto Rico, Ley Núm. 17 de 19 de enero de 1951, según enmendada, así como también cualquier conspiración por la comisión de estos delitos y sus tentativas.

Por su parte, el artículo 62 del mismo cuerpo legal, 33 L.P.R.A. sec. 3302, disponía lo siguiente sobre los efectos de la reincidencia habitual:

> En caso de reincidencia habitual el convicto será declarado por el Tribunal delincuente habitual y será sentenciado a separación permanente de la sociedad mediante reclusión perpetua. No obstante lo dispuesto en la Ley Núm. 116 de 22 de julio de 1974, según enmendada, en cuanto a la facultad de la Administración de Corrección para determinar las instituciones en que habrá de ser ingresada o trasladada la clientela del sistema correccional, **el convicto que sea sentenciado a separación permanente cumplirá todo el término de reclusión en una institución especializada de máxima custodia** y la Administración de Corrección proveerá a este tipo de delincuente todos los servicios y programas en la propia institución, incluyendo aquellos que propendan a su rehabilitación. (Énfasis suplido).

Como surge de las disposiciones citadas, a partir de las enmiendas realizadas al artículo 62 del Código de 1974 mediante la Ley Núm. 34 de 31 de mayo de 1988, los convictos declarados reincidentes habituales y, por tanto, sentenciados a separación permanente de la sociedad, tenían que ser ingresados o trasladados a una institución especializada de máxima custodia durante todo el término de su sentencia.

No obstante, el Código de 1974 fue derogado por la Ley Núm. 149 de 18 de junio de 2004, según enmendada, conocida como el Código Penal del Estado Libre Asociado de Puerto Rico, 33 L.P.R.A. sec. 4629 *et seq.* En este Código, la figura del delincuente habitual se encuentra regulada por el inciso (c) del artículo 81:

> Habrá reincidencia habitual cuando el que ha sido convicto y sentenciado por dos o más delitos

graves, cometidos y juzgados en tiempos diversos e independientes unos de otros, cometa posteriormente un delito grave de primer grado o un delito grave de segundo grado o cualquier delito grave en violación a la Ley de Explosivos de Puerto Rico, Ley Núm. 134 de 28 de junio de 1969 y la Ley Contra el Crimen Organizado, Ley Núm. 33 de 13 de junio de 1978, violación a los Artículos 401, 405, 411 y 411(a) de la Ley de Sustancias Controladas de Puerto Rico, Ley Núm. 4 de 23 de junio de 1971 o a los Artículos 2.14, 5.03 y 5.07 de la Ley de Armas de Puerto Rico, según enmendadas. La pena a aplicar será de noventa y nueve (99) años.

33 L.P.R.A. sec. 4709.

Claramente, tras la entrada en vigor de Código de 2004, la Administración de Corrección ya no está obligada a mantener en una institución especializada de máxima custodia, durante todo el término de reclusión, al convicto sentenciado a separación permanente bajo dicho estatuto.

A pesar de este cambio, aquella conducta incurrida durante la vigencia del Código de 1974 se regirá por las disposiciones de dicho cuerpo legal o por las leyes vigentes al momento en que ocurra el hecho. Así lo establece el artículo 308 del Código de 2004, 33 L.P.R.A. sec. 4937, en lo que la jurisprudencia ha venido a conocer como la cláusula de reserva:

> La conducta realizada con anterioridad a la vigencia de este Código en violación a las disposiciones del Código Penal aquí derogado o de cualquier otra ley especial de carácter penal se regirá por las leyes vigentes al momento del hecho.
>
> Si este Código suprime algún delito no deberá iniciarse el encausamiento, las acciones en trámite deberán sobreseerse, y las sentencias condenatorias deberán declararse nulas y liberar a la persona. El cambio de nombre de un delito no significa que el tipo delictivo ha quedado suprimido.

*Id. Véanse Pueblo v. González*, 165 D.P.R. 675 (2005); *Pueblo v. Padín Rodríguez*, 169 D.P.R. 460 (2006).

### C

El 16 de septiembre de 2004, la Asamblea Legislativa de Puerto Rico aprobó la Ley Núm. 377, mejor conocida como la Ley de Mandato Constitucional de Rehabilitación. Esta ley convirtió en mandato la aspiración contenida en la Sección 19 del Artículo VI de nuestra Constitución de propender al tratamiento adecuado de los delincuentes para hacer posible su rehabilitación moral y social.

La exposición de motivos de la Ley de Rehabilitación denota claramente la preocupación de nuestros legisladores al redactar la pieza legislativa:

> Ante el auge de la acción delictiva y la creciente manifestación de conducta violenta en jóvenes y adultos, desde hace años se ha reclamado examinar la política pública y la acción del Gobierno en materia correccional. Estudios recientes, recomendaciones de Comisiones Especiales, datos empíricos y el juicio de peritos en sociología y criminología han planteado la necesidad urgente de transformar la política correccional como componente fundamental de un sistema de justicia criminal que también ha fracasado estrepitosamente.
> No puede soslayarse por más tiempo que las estrategias implantadas en Puerto Rico desde el 1974 hasta el presente, en lugar de prevenir o reprimir la comisión de delitos, parecen reproducir o fomentar la criminalidad. Existe consenso en el reconocimiento de la complejidad del problema pero se recomienda consistentemente que se evalúen los programas de rehabilitación de sentenciados y el sistema penal en general para proveer alternativas que aminoren la conducta violenta y delictiva desde fases tempranas.

Como datos que corroboran la necesidad de cambio y transformación, la Asamblea Legislativa reconoció, entre otros, los siguientes hechos: que los estudios sobre la realidad puertorriqueña demuestran que la mayor parte de la población encarcelada cumple por delitos que no son de violencia y que, actualmente, la prisión como pena no contribuye en los procesos de reintegración del individuo a la sociedad ni a su rehabilitación; que la reincidencia en la actividad de los egresados de las instituciones carcelarias y de los programas comunitarios vigentes indican el fracaso de la prisión como institución que busca la rehabilitación; y que **para prevenir la reincidencia es necesario ampliar los programas dirigidos a preparar al sentenciado para su reinserción a la sociedad y hacerlos disponibles** *a toda la población penal*.

Para atender estas preocupaciones, el artículo 3 de la Ley de Rehabilitación, 4 L.P.R.A. sec. 1611, establece que:

> **A partir de la vigencia de esta Ley,** las agencias gubernamentales, principalmente entiéndase, el Departamento de Corrección y Rehabilitación, **la Administración de Corrección,** la Administración de Instituciones Juveniles, la Corporación de Empresas de Adiestramiento y Trabajo y la Junta de Libertad bajo Palabra, así como las concernidas organizaciones comunitarias que voluntariamente participen en este esfuerzo, **pondrán en ejecución programas de rehabilitación que impacten** *a toda la población sentenciada*, incluidos los adultos y menores transgresores, que necesiten estos servicios.
>
> Para cumplir la obligación impuesta en esta Ley, el sistema de rehabilitación a la población sentenciada, tanto adultos como menores transgresores, satisfará los siguientes requisitos y exigencias, e incluirá las siguientes características:

(a)  **Clasificación adecuada de la población correccional y revisión continua de esta clasificación** conforme a los ajustes y cambios de la clientela. . . .

(b)  Integración y participación activa de la población correccional, sus familiares, el personal correccional y las víctimas en el diseño, implantación y **evaluación periódica de los sistemas de clasificación y los programas de rehabilitación.**

(c)  Incorporación y ampliación de los programas de salud correccional y salud mental a tal grado que estén disponibles **para toda la población penal . . . .**

*Id.* (énfasis suplido).

**D**

La Ley de Procedimiento Administrativo Uniforme, Ley Núm. 170 de 12 de agosto de 1988, 3 L.P.R.A. sec. 2101 *et seq.*, y su jurisprudencia interpretativa nos obligan a examinar toda determinación administrativa con cierto grado de deferencia. Esta norma va unida a una presunción de legalidad y corrección que debe respetarse mientras no se pruebe convincentemente lo contrario. *Rivera Concepción v. A.R.Pe.*, 152 D.P.R. 116 (2000); *Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R.*, 144 D.P.R. 425 (1997). Por tanto, la revisión judicial es limitada. Sólo procede cuando la agencia actúa arbitrariamente o de manera tan irrazonable que el acto resulta un abuso de su discreción. El propósito detrás de la norma prudencial es "evitar la sustitución del criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor". *Reyes Salcedo v. Policía de P.R.*, 143 D.P.R. 85 (1997).

No obstante, el tribunal podrá revisar las conclusiones de derecho de la agencia en todos sus aspectos, sin sujeción a norma o criterio alguno. 3 L.P.R.A. sec. 2175; O.E.G. v. Román, 159 D.P.R. 401 (2003); P.R.T.C. v. J. Reg. Tel, de P.R., 151 D.P.R. 269 (2000). Aun así, el tribunal revisor no debe descartar libremente las interpretaciones o conclusiones de la agencia administrativa, sino que deberá dar deferencia en la medida en que éstas sean razonables. *Misión Ind. P.R. v. J.P.*, 146 D.P.R. 64, 132 (1998). Por tanto, el tribunal sostendrá las conclusiones mientras las mismas sean cónsonas con el propósito legislativo y no sean arbitrarias, ilegales o irrazonables. *T-JAC, Inc. v. Caguas Centrum Limited*, 148 D.P.R. 70, 80 (1999).

### III

Luego de evaluar detenidamente el derecho aplicable a la situación fáctica ante nuestra consideración, estoy convencida de que la Ley de Rehabilitación dejó sin efecto la prohibición establecida en el artículo 62 del Código de 1974, por lo cual el señor López Borges era acreedor a que el Comité de Clasificación revaluara su clasificación y auscultara la posibilidad de reducir su nivel de custodia a una más baja de entender el Comité que el confinado cumplía con los demás requisitos reglamentarios aplicables.

### A

La Administración de Corrección plantea que el Tribunal de Apelaciones aplicó erróneamente el artículo 81 del Código de 2004, el cual le resulta más benigno, a hechos ocurridos

bajo la vigencia del Código de 1974, en violación a la cláusula de reserva recogida en el artículo 308 del Código actual. No tiene razón.

Como señala la profesora Dora Nevares, el propósito de la cláusula de reserva del artículo 308 es que "la conducta realizada con anterioridad a la vigencia del nuevo y vigente Código en violación a alguna disposición del Código Penal derogado, o cualquier otra ley especial de carácter penal, se regirá por las leyes vigentes al momento del hecho con la sola excepción, contemplada en el segundo párrafo del mencionado Artículo [308], la cual establece que si el Código suprime algún delito no se deberá encausar a la persona por ese delito y que cualquier acción en trámite debe sobreseerse". Nevares Muñiz, *Nuevo Código Penal de Puerto Rico*, Comentado 389 (2005).

Esta cláusula sencillamente impide que una persona acusada bajo el Código de 1974 invoque el principio de favorabilidad recogido en el artículo 9 actual, 33 L.P.R.A. 4607, para beneficiarse de las penas más benignas establecidas **en un artículo del Código Penal de 2004**. *Véanse Pueblo v. Negrón Rivera*, 2011 T.S.P.R. 157, 183 D.P.R. ___ (2011); *Pueblo v. Padín Rodríguez*, 169 D.P.R. 460 (2006); *Pueblo v. González*, 165 D.P.R. 675 (2005). Mas eso no fue lo que sucedió en el caso ante nuestra consideración. La Ley de Rehabilitación es una ley especial de carácter penal, con implicaciones procesales y sustantivas de índole constitucional, **a la cual no le aplica la cláusula de**

**reserva del artículo 308.** No se trata de una mera disposición del Código de 2004. La medida fue aprobada por la Asamblea Legislativa el 16 de septiembre de 2004 y entró en vigor inmediatamente después de su aprobación; por tanto, a pesar de que esta ley se aprobó aproximadamente tres (3) meses después del Código de 2004, entró en vigor aproximadamente ocho (8) meses antes que éste. Además, las disposiciones del nuevo Código no contravinieron en absoluto el mandato recogido en la Ley de Rehabilitación, sino todo lo contrario: lo complementaron.

Por tanto, procede la aplicación de la Ley de Mandato Constitucional de Rehabilitación al caso de autos. Se trata de una ley especial posterior al Código de 1974, que, además de haber sido aprobada luego del Código de 2004, no fue contravenida por la entrada en vigor de este cuerpo legal de carácter general.

**B**

La exposición de motivos  de la Ley de Rehabilitación es clara en cuanto a la voluntad legislativa de "ampliar los programas dirigidos a preparar al sentenciado para su reinserción a la sociedad **y hacerlos disponibles a toda la población penal**". Asimismo, su artículo 3, 4 L.P.R.A. sec. 1611, utiliza un lenguaje diáfano y absoluto: "A partir de la vigencia de esta Ley . . . la Administración de Corrección . . . pondrá en ejecución programas de rehabilitación que impacten **a toda la población sentenciada**". Más adelante, añade que "[p]ara cumplir la

obligación impuesta en esta Ley, el sistema de rehabilitación **a la población sentenciada** . . . satisfará los siguientes requisitos y exigencias, e incluirá las siguientes características: (a) Clasificación adecuada de la población correccional y revisión continua de esta clasificación . . . . (b) Integración y participación activa de la población correccional, sus familiares, el personal correccional y las víctimas en el diseño, implantación y evaluación de los sistemas de clasificación y los programas de rehabilitación. . . . (C) Incorporación y ampliación de los programas de salud correccional y salud mental a tal grado que estén **disponibles para toda la población penal**. Tras una lectura simple del artículo precitado, es evidente que la intención legislativa era que los nuevos mecanismos de clasificación y los programas de rehabilitación fueran aplicables a toda la población correccional, sin distinción alguna.

### C

No obstante reconocer que la Ley de Rehabilitación extiende su aplicación a todos los confinados, la opinión disidente concluye, basándose en el Reglamento de 2000, que ello "**no necesariamente** conlleva una reducción en el nivel de seguridad en que se custodia al evaluado". Pág. 11 de la opinión disidente. También reconoce que "[l]a reclasificación es parte del proceso de rehabilitación" y que "[s]i bien es cierto que una fase de la reclasificación va dirigida a analizar el nivel de custodia en que debe

estar el confinado, eso no es el único propósito de este proceso". *Id.* en la pág. 12.

La disidencia tiene razón al expresar que cambiar el nivel de custodia de un confinado no es el fin único del proceso de reclasificación; pero puede ser uno de ellos. El hecho de que la revaluación de la clasificación de un confinado **no necesariamente** implique una reducción del nivel de custodia, significa, lógica e indubitadamente, que, en algunas ocasiones, sí podría resultar en un cambio al nivel de custodia asignado originalmente. Por tanto, no procedía que el Comité de Clasificación rechazara la solicitud del señor López Borges meramente por éste haber sido declarado reincidente habitual. La ley no dispone tal excepción. Después de todo, el delincuente habitual, como todo confinado, también es parte de "toda la población correccional".

Los fundamentos en que se sostiene la opinión disidente no son convincentes jurídicamente. Un análisis lógico-deductivo refleja el error subyacente. Por un lado, reconoce que la Ley de Rehabilitación aplica a todos los confinados sin distinción alguna. *Id.* en la pág. 11. Reconoce, además, que la reclasificación es parte del proceso de rehabilitación. *Id.* en la pág. 12. Finalmente, admite que una fase de la reclasificación va dirigida a analizar el nivel de custodia en que debe estar el confinado. *Id.* No obstante, resuelve que, en este caso, el confinado tiene derecho a beneficiarse de los programas de rehabilitación e

incluso de los procesos de reclasificación establecidos como parte de la Ley de Rehabilitación, mas no puede gozar de una de las fases más importantes de dicho proceso: el cambio en su nivel de custodia. Nuevamente, la ley no crea tal excepción.

La disidencia se ampara incorrectamente en definiciones recogidas en el Reglamento de 2000. Según la opinión de la minoría, "el Manual de Clasificación [Reglamento de 2000] hace un reconocimiento expreso de los efectos de la reincidencia habitual sobre las condiciones en que el confinado debe extinguir su pena. Reitera que debe cumplirla en una institución de seguridad máxima". *Id.* en las págs. 12-13. Evidentemente, dicho Manual, promulgado cuatro (4) años antes que la Ley de Rehabilitación, no podía decir otra cosa pues debía cumplir con la prohibición del artículo 62 del Código de 1974. Pero dicha prohibición quedó sin efecto tras la aprobación de ley en cuestión. Además, incluso si dicho lenguaje quedara intacto en reglamentos ulteriores, ninguna agencia administrativa está facultada para aprobar disposiciones reglamentarias que contravengan la voluntad legislativa plasmada en leyes. Por tanto, la Administración de Corrección no podría, mediante reglamento, limitar lo que la Asamblea Legislativa amplió mediante ley.

Los disidentes yerran también al expresarse sobre artículo 7 de la Ley de Rehabilitación para fortalecer su argumento. Esta disposición no tiene nada que ver con la controversia ante nuestra consideración. Este artículo

establece el procedimiento de certificación de rehabilitación mediante el cual el Secretario del Departamento de Corrección y Rehabilitación podrá emitir un certificado de rehabilitación con la consecuencia de dar por cumplido el resto de la pena privativa de la libertad de un confinado, luego de que el tribunal que dictó sentencia evalúe el asunto. En este caso, el señor López Borge no solicita la emisión de este certificado de rehabilitación. Está solicitando, únicamente, que, como parte de su evaluación de clasificación, se ausculte la posibilidad de reducir su nivel de custodia.

Además, a pesar de que la redacción original del artículo 7 disponía inexpugnablemente que el tribunal que dictó sentencia podía dar por cumplida la sentencia de "cualquier persona convicta por delito grave, **incluyendo a los sentenciados con anterioridad a la vigencia de este Ley**", los disidentes se cobijan nuevamente en una disposición reglamentaria (esta vez del Reglamento de 2007) para sostener que "[e]l hecho de que una sentencia por delincuencia habitual implique la comisión, no de uno, sino de varios delitos graves cometidos en diferentes instancias, lo excluye del manto del beneficio". *Id.* en la pág. 14. En primer lugar, el precitado artículo expresaba rotundamente que el beneficio estaría disponible para todo sentenciado por delito grave. No hacía ninguna excepción para reincidentes habituales. En segundo lugar, los disidentes concluyen que el sentenciado debía cumplir con las normas

del Código Penal y los reglamentos pertinentes para aprovechar este beneficio. Tienen razón. Sin embargo, en este caso, la Ley de Rehabilitación se imponía sobre el Código de 1974 y ningún reglamento administrativo, anterior o posterior, podía primar sobre ella.

Como si fuera poco, la opinión disidente omite discutir un asunto clave: que el artículo 7 de la Ley de Rehabilitación fue enmendado por la Ley Núm. 165 de 16 de diciembre de 2009. Esta ley ciertamente limitó el alcance de la Ley de Rehabilitación; **pero sólo respecto a la concesión de certificados de rehabilitación por parte del Secretario del Departamento de Corrección y Rehabilitación**. Por ello, la Asamblea Legislativa decidió eliminar del artículo 7 la cláusula que facultaba al tribunal sentenciador a dar por cumplida la sentencia de aquellos confinados "sentenciados con anterioridad a la vigencia de esta Ley". Todo lo demás quedó inalterado. La Asamblea Legislativa interpretó correctamente que la medida legislativa aprobada en 2004, en su totalidad, tenía un efecto tan abarcador y extensivo, que había que limitar mediante legislación un aspecto particular de su aplicación. Por ende, mientras que aquella Rama tuvo que legislar para que el beneficio del certificado de rehabilitación no aplicara retroactivamente, los jueces disidentes resolverían hoy que no hay problema con que aplique retroactivamente, pero no a delincuentes habituales.

La realidad es que, bajo el estado de derecho vigente, el señor López Borges no tiene derecho a que su sentencia se

dé por cumplida por un tribunal tras la emisión de un certificado de rehabilitación por parte del Secretario del Departamento de Corrección. Sin embargo, esto se debe al momento en que el confinado fue sentenciado y no a que haya sido declarado reincidente habitual.

Por supuesto, nada de lo dispuesto anteriormente altera, en lo más mínimo, el resultado al que debemos llegar el día de hoy, pues los fundamentos aplicables al caso ante nuestra consideración no se encuentran en el artículo 7 de la Ley de Rehabilitación, sino en partes de su exposición de motivos y del artículo 3, donde se recoge repetidamente la intención de aplicar los programas de rehabilitación y los procesos de reclasificación a toda la población correccional. Ninguna de esas disposiciones fue eliminada. Por tanto, lejos de menoscabar el resultado expresado, la enmienda producida en 2009 reafirma el alcance abarcador del resto de la Ley de Rehabilitación.

En fin, la resolución emitida por la Supervisora de la Oficina de Clasificación, cuya revisión se solicitó ante el Tribunal de Apelaciones, estableció como fundamento para su determinación la prohibición contenida en el artículo 62 del Código de 1974. Por tanto, erró en su conclusión de derecho en torno a que estaba impedida de revisar el nivel de custodia asignado al señor López Borges por éste haber sido declarado reincidente habitual y sentenciado a la separación permanente de la sociedad mediante la reclusión en una institución especializada de custodia máxima. Por tal razón,

procede confirmar la determinación del Tribunal de Apelaciones que devolvió el caso al Comité de Clasificación para que éste evalúe, sin impedimento del artículo 62 del Código de 1974, si el señor López Borges cumple con los demás requisitos reglamentarios para ser reclasificado a un nivel de custodia menor al actual.

## IV

Por entender que los mecanismos de rehabilitación y reclasificación de custodia plasmados en la Ley de Mandato Constitucional de Rehabilitación de 2004 son aplicables a toda la población correccional, independientemente de que el confinado haya sido declarado reincidente habitual bajo el Código Penal de 1974, estoy conforme con la opinión del Tribunal.

Anabelle Rodríguez Rodríguez
Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Jacinto López Borges<br><br>Recurrido<br><br>v.<br><br>Administración de Corrección<br><br>Peticionario | CC-2010-611 | |

Opinión disidente emitida por el Juez Asociado señor MARTÍNEZ TORRES a la cual se unen la Jueza Asociada señora PABÓN CHARNECO y los Jueces Asociados señor RIVERA GARCÍA y señor FELIBERTI CINTRÓN.

En San Juan, Puerto Rico, a 24 de mayo de 2012.

El presente caso exige que determinemos si un convicto por reincidencia habitual bajo el Código Penal de 1974, Ley Núm. 115 de 22 de julio de 1974, puede cumplir parte de su condena fuera de la custodia máxima a la que se le condenó bajo el estatuto derogado. En esta ocasión, se plantea la controversia a la luz de la Ley de Mandato Constitucional de Rehabilitación, Ley Núm. 377-2004. 4 L.P.R.A. secs. 1611 y ss. Por entender que la Ley de Mandato Constitucional de Rehabilitación no enmendó el Art. 62 del Código Penal de 1974, disiento respetuosamente de la Opinión mayoritaria. Entiendo que la postura que hoy adopta este Tribunal sienta las bases para que eventualmente se declare inconstitucional la custodia máxima, fin ajeno al verdadero propósito de la Ley de Mandato Constitucional de Rehabilitación, _supra_.

I

El 2 de mayo de 1991, al Sr. Jacinto López Borges se le encontró culpable por violación del Art. 173 del Código Penal de 1974 (robo) y violación del Art. 4 de la Ley de Armas de 1951. Se le sentenció a la pena de separación permanente de la sociedad bajo custodia máxima tras declarársele reincidente habitual el 4 de junio de 1991, conforme a los Arts. 61 y 62 del Código Penal de 1974. Además, se le sentenció a 6 meses de prisión a cumplirse concurrentemente con la condena perpetua, por la violación a la Ley de Armas. De su condena a perpetuidad por la declaración de reincidencia habitual, tiene que cumplir en prisión, como mínimo, hasta el 15 de octubre de 2020.

En prisión, recibió tratamiento contra la adicción, terminó el cuarto año de escuela superior y ha trabajado en el área de empaque. No se han presentado querellas ni celebrado vistas disciplinarias en su contra.

El 10 de diciembre de 2008 el Comité de Clasificación y Tratamiento del Anexo 296 de Guayama ratificó que el señor López Borges permaneciera en custodia máxima. Para llegar a esa conclusión, descansó en lo que dispone el Art. 62 del Código Penal de 1974, bajo el que se le declaró reincidente habitual.

El señor López Borges apeló la determinación ante la Supervisora de la Oficina de Clasificación, quien denegó revisar la decisión el 19 de diciembre de 2009. Nuevamente, se atendió a lo que disponía el Código Penal de 1974 sobre la reincidencia habitual.

Inconforme, el señor López Borges acudió al Tribunal de Apelaciones. Allí planteó que la Ley de Mandato Constitucional de Rehabilitación permite que un convicto por reincidencia habitual pueda cumplir su condena bajo un tipo de clasificación diferente al de custodia máxima. Según el convicto, esta ley tuvo el efecto de enmendar el Código Penal de 1974, unos meses antes de que entrara en vigencia el Código Penal actual.

El Tribunal de Apelaciones, en una votación dos a uno[31], dio la razón al confinado el 14 de mayo de 2010. Concluyó que la Ley de Mandato Constitucional de Rehabilitación aplica a todos los confinados, incluso aquellos que fueron convictos con anterioridad a la aprobación del estatuto. Interpretó que la ley no hizo excepción al establecer un mecanismo de reevaluación de confinados y, por consiguiente, viabilizó que los convictos habituales bajo el anterior Código Penal pudieran ser merecedores de que se les rebajara el nivel de seguridad.

El foro apelativo intermedio devolvió el caso al Comité para que reevaluara al señor López Borges sin que se tomara en consideración el requisito del Art. 62 del Código Penal derogado, que requería separación permanente en una prisión de máxima seguridad para los reincidentes habituales.

Inconforme, la Administración de Corrección recurre ante nos. En esencia, plantea que el Tribunal de

---

[31] La Sentencia del Tribunal de Apelaciones <u>Jacinto López Borges v. Administración de Corrección</u>, KLRA2009-258, contó con el voto a favor de los jueces Aponte Hernández y Cabán García. El juez Escribano Medina escribió un voto disidente.

Apelaciones erró al aplicar la Ley de Mandato Constitucional de Rehabilitación a un declarado reincidente habitual bajo el Código Penal de 1974 y, de esta forma, concederle la posibilidad de reducir de máxima el nivel de seguridad en que está confinado. Argumenta que el Tribunal de Apelaciones aplicó erróneamente el principio de favorabilidad que recoge el Art. 9 del Código Penal de 2004, 33 L.P.R.A. sec. 288.

El 28 de enero de 2011 expedimos el auto. Ambas partes comparecieron.

## II-A

El Código Penal de 1974, supra, al igual que el Código Penal vigente, establecía tres grados de reincidencia para las personas convictas en más de una ocasión: reincidencia, reincidencia agravada y reincidencia habitual.

En cuanto a la reincidencia habitual, que es la que concierne a este caso, el Art. 61 del Código Penal de 1974 establecía que se constituía cuando

> el que ha sido convicto y sentenciado por dos o más delitos graves cometidos en tiempos diversos e independientes unos de otros cometiere posteriormente cualquiera de los siguientes delitos o sus tentativas: asesinato, robo, incesto, extorsión, violación, sodomía, actos lascivos o impúdicos cuando la víctima fuere menor de catorce (14) años, secuestro, agresión agravada en su modalidad grave, escalamiento agravado, apropiación ilegal agravada de vehículos de motor o sus partes, incendio agravado, sabotaje de servicios públicos esenciales, fuga cuando la persona está cumpliendo sentencia firme o en trámite de apelación por un delito grave, cualquier delito grave en violación a la Ley de Explosivos de Puerto Rico, Ley Núm. 134 de 28 de junio de 1969 y a la Ley contra el Crimen Organizado, Ley Núm. 33 de 13 de junio de 1978, violación a los artículos 401, 405 y 411(a) de la Ley de Sustancias Controladas de Puerto Rico Ley Núm. 4 de 23 de junio de 1971 o a los artículos 5 y 8(a)

de la Ley de Armas de Puerto Rico Ley Núm. 17 de 19 enero de 1951, según enmendada, así como también cualquier conspiración por la comisión de estos delitos y sus tentativas.

El Art. 62(c) del Código Penal anterior advertía que aquellos declarados reincidentes habituales recibirían una sentencia de separación permanente de la sociedad, mediante reclusión perpetua, a cumplirse en una institución especializada de seguridad máxima. De esta forma, ese artículo hizo una excepción expresa a la Ley Orgánica de la Administración de Corrección, Ley Núm. 116 de 22 de julio de 1974, para retirarle a la agencia la discreción de determinar la institución en que los reincidentes habituales cumplirían su condena.

> En caso de reincidencia habitual el convicto será declarado por el Tribunal delincuente habitual y será sentenciado a separación permanente de la sociedad mediante reclusión perpetua. No obstante lo dispuesto en la Ley Núm. 116 de 22 julio de 1974, según enmendada, en cuanto a la facultad de la Administración de Corrección para determinar las instituciones en que habrá de ser ingresada o trasladada la clientela del sistema correccional, el convicto que sea sentenciado a separación permanente cumplirá todo el término de reclusión en una institución especializada de máxima custodia y la Administración de Corrección proveerá a este tipo de delincuente todos los servicios y programas en la propia institución, incluyendo aquellos que propendan a su rehabilitación.

Art. 62(c), Código Penal de 1974.

Así, una vez la Administración de Corrección recibía la custodia de un reincidente habitual, no tenía más opciones bajo el Código Penal de 1974 que ubicarlo en custodia máxima. A pesar de ello, se proveían todos los servicios y programas dirigidos a la rehabilitación del confinado.

El Art. 81(c) del Código Penal de 2004, Ley 149-2004, 33 L.P.R.A. sec. 4709(c), se limita a imponer una condena de 99 años al convicto por reincidencia habitual. No dispone acerca de que la condena deba cumplirse bajo una custodia de seguridad máxima. Sin embargo, el Código Penal vigente tiene una cláusula de reserva, en su Art. 308, 33 L.P.R.A. sec. 4935, que específicamente señala que las conductas realizadas con anterioridad a la vigencia del estatuto se regirán por las leyes vigentes al momento del hecho. La única excepción abarca aquellos casos en que se haya suprimido el delito que tipifica la conducta cometida. En esas instancias se sobreseerán los casos pendientes y se declararán nulas las sentencias condenatorias.

Nuestra interpretación de esta cláusula de reserva ha impedido la aplicación del Código Penal de 2004 a delitos cometidos antes de que comenzara su vigencia, el 1 de mayo de 2005. Pueblo v. González, 165 D.P.R. 675 (2005). Véanse, además, las Resoluciones emitidas en Pueblo v. Negrón Rivera, 2011 T.S.P.R. 157, 183 D.P.R. ___ (2011), y Pueblo v. Padín Rodríguez, 169 D.P.R. 460 (2006).

B

La Constitución de Puerto Rico, Art. VI, Sec. 19, establece como política pública del Estado Libre Asociado

> reglamentar las instituciones penales para que sirvan a sus propósitos en forma efectiva y propender, dentro de los recursos disponibles, al tratamiento adecuado de los delincuentes para hacer posible su rehabilitación moral y social.

Art. VI, Sec. 19, Const. P.R., L.P.R.A., Tomo 1.

Esa expresión de política pública estaba condicionada a los recursos disponibles por parte del Estado. En el 2004 se aprobó la Ley de Mandato Constitucional de Rehabilitación, supra, para establecer que el Gobierno cuenta con los recursos económicos para viabilizar el mandato de rehabilitación que recogió la Constitución en 1952.

La Ley de Mandato Constitucional de Rehabilitación se aprobó como parte de un paquete de más de treinta leyes que constituyeron la Reforma Penal de 2004. R. N. Bell Bayrón, La significativa aportación al compromiso con la rehabilitación del sentenciado de la Reforma Penal del 2004 y de la Ley del Mandato Constitucional de Rehabilitación, 40 Rev. Jur. U.I.P.R. 1 (2005). La ley se aprobó el 16 de septiembre de 2004, tres meses después que el Código Penal de 2004. Sin embargo, entró en vigencia aproximadamente ocho meses antes de que empezara a regir ese Código Penal, vigente hoy.

El estatuto requiere que las agencias gubernamentales relacionadas al sistema de corrección pongan "en ejecución programas de rehabilitación y de reinserción que impacten a **toda la población sentenciada**". (Énfasis nuestro). Art. 3, 4 L.P.R.A. sec. 1611. Además requiere

> (a)**Clasificación adecuada** de la población correccional y revisión continua de esta clasificación conforme a los ajustes y cambios de la clientela. Esta clasificación se efectuará por equipos multidisciplinarios que laborarán en las propias instituciones penales o, en estrecha

> relación con los programas comunitarios que participen voluntariamente en este esfuerzo.

> .   .   .   .   .   .   .   .

> (g) Diseño y desarrollo de programas y parámetros de medición para asegurar que el proceso de rehabilitación esté enfocado hacia el cambio en los patrones de conducta conducentes a la actividad delictiva por la cual se cumple sentencia. (Énfasis nuestro)

Íd.

Esa ley también dispuso en su Art. 7, 4 L.P.R.A. sec. 1615, un procedimiento para que, bajo ciertas circunstancias, un convicto por delito grave pueda obtener certificación de rehabilitación por parte del Departamento de Corrección y Rehabilitación. Con esa certificación, el convicto podría solicitar a los tribunales que den por cumplida la sentencia que enfrenta.

El Manual para Crear y Definir Funciones del Comité de Clasificación de Confinados, Reglamento Núm. 7334 de 10 de abril de 2007, canaliza la concesión de las Certificaciones de Rehabilitación. Este manual impide que una persona que haya sido convicta en dos ocasiones o más pueda cualificar para el beneficio. Manual para Crear y Definir Funciones del Comité de Clasificación de Confinados, supra, pág. 7.

Por otro lado, el Manual de Clasificación de Confinados de la Administración de Corrección, Reglamento Núm. 6067 de 22 de enero de 2000, instrumentaliza la reclasificación de los confinados. Este reglamento está vigente a pesar de que se aprobó antes de que entrara en vigor la Ley de Mandato Constitucional de Rehabilitación, supra.[32] El manual señala en su Introducción que

---

[32] Aunque la Administración de Corrección ha aprobado dos manuales de clasificación luego del Reglamento Núm. 6067,

> la clasificación de los confinados consiste en la separación sistemática y evolutiva de los confinados en subgrupos, en virtud de necesidades de cada individuo, y las exigencias y necesidades de la sociedad, que continúa desde la fecha de ingreso del confinado hasta la fecha de su excarcelación. Además de satisfacer las necesidades del confinado, el proceso de clasificación **coordina la custodia física de los confinados con los programas y recursos disponibles** dentro del sistema correccional… [p]ara lograr un sistema de clasificación funcional, el proceso tiene que ubicar a cada confinado al programa y **el nivel de custodia menos restrictivo posible para el que cualifique**, sin menoscabar la seguridad y las necesidades de la sociedad, de los demás confinados, y del personal correccional. [Énfasis suplido].

Manual de Clasificación de Confinados, íd, pág. 1.

La Sección 1 del Manual de Clasificación de Confinados, que contiene las Definiciones Claves y Glosario de Términos, hace un reconocimiento expreso de los efectos de una sentencia de reincidencia habitual declarada bajo el Código Penal de 1974. Específicamente indica que los declarados delincuentes habituales serán ingresados o trasladados a una institución de seguridad máxima.[33] Manual de Clasificación de Confinados, íd., pág. 3.

Además, el Manual de Clasificación de Confinados define que la reclasificación es la "[r]evisión periódica de los confinados en lo que respecta a su progreso como parte del Plan Institucional, así como también su categoría de custodia".

---

ninguno está vigente actualmente. El Reglamento Núm. 7062 de 30 de noviembre de 2005 y el Reglamento Núm. 7295 de 14 de febrero de 2007 están inactivos a raíz de una orden del Tribunal Federal para el Distrito de Puerto Rico en el caso <u>Morales Feliciano v. Fortuño Burset</u>, Civil Núm. 79-4.

[33] Este reconocimiento permaneció intacto en los reglamentos posteriores, que no están en vigencia. Es decir, en el Reglamento Núm. 7295, <u>supra</u>, y en el Reglamento Núm. 7062, <u>supra</u>.

Manual de Clasificación de Confinados, íd., pág. 8. Al mismo tiempo, el Plan Institucional es "una evaluación escrita de las necesidades de cada confinado en lo que respecta a programas y servicios, y las actividades programadas que se recomiendan para llenar esas necesidades". Manual de Clasificación de Confinados, íd., pág. 7.

En el inciso del Manual de Clasificación de Confinados que señala los objetivos de la reclasificación de custodia se reconoce que este proceso

> **no necesariamente tiene como resultado un cambio en la clasificación de custodia** o la vivienda asignada. Su función principal es supervisar la adaptación del confinado y prestarle atención a cualquier situación pertinente que pueda surgir. [Énfasis nuestro].

Manual de Clasificación de Confinados, íd., pág.39.

### III

Contra el señor López Borges pesa una sentencia de reincidencia habitual, impuesta bajo el Código Penal de 1974. Acorde con lo que disponía el estatuto, se le condenó a cumplir su cadena perpetua en una institución de máxima seguridad.

Tras cumplir 17 años en prisión, solicitó continuar su confinamiento en una prisión con un nivel menor de custodia, al amparo de la Ley de Mandato Constitucional de

Rehabilitación, _supra_. El Tribunal de Apelaciones acogió su planteamiento de que esta ley enmendó el Código Penal de 1974. De esta manera, el foro apelativo intermedio concluyó que los declarados reincidentes habituales bajo el Código Penal de 1974 no tendrían que extinguir su condena en una prisión de máxima

seguridad. Sin embargo, el análisis de la ley en la que se amparó el confinado, y de los reglamentos mediante los cuales se instrumentaliza, nos lleva a una conclusión diferente a la que llegó el Tribunal de Apelaciones y la mayoría de este Tribunal.

Si bien es cierto que la Ley de Mandato Constitucional de Rehabilitación, supra, extiende su aplicación a "todos los confinados" eso no necesariamente conlleva una reducción en el nivel de seguridad en que se custodia al evaluado. Entre los propósitos de la Ley de Mandato Constitucional de Rehabilitación se encuentra declarar como política pública que el Estado cuenta con los recursos para cumplir con la aspiración de rehabilitación que se recogió en el Art. VI, Sec. 19, de la Constitución de Puerto Rico. Además, se describe un sistema para la rehabilitación del confinado que incluye, en su Art. 3, una "**clasificación adecuada** de la población correccional". [Énfasis nuestro]. También la ley crea un comité de ciudadanos para contribuir en su implementación. Por último, se proveyó para la expedición de certificaciones de rehabilitación mediante las cuales los tribunales pueden dar por cumplida la sentencia de convictos por delitos graves, bajo ciertas circunstancias.

La reclasificación es parte del proceso de rehabilitación. Si bien es cierto que una fase de la reclasificación va dirigida a analizar el nivel de custodia en que debe estar el confinado, ese no es el único propósito de este proceso. La reclasificación también tiene el propósito de evaluar el avance del confinado en el Plan Institucional establecido. Este plan

va dirigido a ubicar al confinado en programas, servicios y actividades.

Es decir, el hecho de que la ley provea para que todos los confinados se reclasifiquen regularmente no implica que se tenga que considerar un cambio en su nivel de custodia. Esa reclasificación también cumple el propósito de identificar los mejores programas y servicios que las circunstancias de la sentencia impuesta le permitan recibir al confinado.

Esto se hace patente en el Manual de Clasificación de Confinados, que entre sus objetivos reconoce que el resultado del proceso de reclasificación no necesariamente significa un cambio en el nivel de custodia del confinado puesto que "**su función principal** es supervisar la adaptación del confinado y prestarle atención a cualquier situación pertinente que pueda surgir." Manual de Clasificación de Confinados, <u>supra</u>, pág. 39. (Énfasis nuestro)

Además, el Manual de Clasificación de Confinados hace un reconocimiento expreso de los efectos de la reincidencia habitual sobre las condiciones en que el confinado debe

extinguir su pena. Reitera que debe cumplirla en una institución de seguridad máxima.

El confinado plantea que si la ley pretendía hacer una excepción con los declarados reincidentes habituales debía hacerse constar de manera expresa. Su argumento no me convence porque era innecesaria una excepción. Como vemos, el cumplimiento con las condiciones de su condena no es

incompatible con lo que dispone la Ley de Mandato Constitucional de Rehabilitación. Él es merecedor, y lo ha sido, de que se le reclasifique regularmente. Sin embargo, eso no equivale a que se le cambie el nivel de custodia al que se le condenó. Nada en la ley conduce a esa conclusión.

La Ley de Mandato Constitucional de Rehabilitación exige solamente que se clasifique a cada confinado adecuadamente. No ordena, como interpreta la mayoría, a que se le reclasifique en un nivel de custodia para el que no cualifica según la ley que lo llevó a la cárcel. La clasificación adecuada y el nivel de custodia menos restrictivo posible para el que cualifica el Sr. López Borges es la custodia máxima. Con esto no se vulnera su derecho a la rehabilitación. Él puede participar de los programas y servicios que la Administración de Corrección provee en la institución en que está confinado, mientras cumple el tiempo requerido en prisión.

De la misma forma, su sentencia como delincuente habitual le impide recibir una certificación de rehabilitación, conforme el Art. 7 de la Ley de Mandato Constitucional de Rehabilitación. Este beneficio está disponible para aquellos sentenciados por delito grave. El hecho de que una sentencia por delincuencia habitual implique la comisión, no de uno, sino de varios delitos graves cometidos en diferentes instancias, lo excluye del manto del beneficio. El Manual para Crear y Definir Funciones del Comité de Clasificación de Confinados, _supra_, así lo reitera. "Queda claro que para ser elegible, el sentenciado debe cumplir con las normas establecidas en el Código Penal y los requisitos que

se establezcan mediante reglamento…". Bell Bayrón, supra, pág. 10. Para llegar a esta conclusión es innecesario entrar en el análisis de la cláusula de reserva del Código Penal de 2004, asunto que ya hemos atendido en jurisprudencia previa.

La rehabilitación de los confinados es un mandato del Art. VI, sec. 19, de la Constitución de Puerto Rico, supra. La ley que interpretamos hoy tiene el propósito de viabilizar ese mandato. Lamentablemente, este Tribunal resuelve que la custodia máxima es incompatible con el propósito rehabilitador de nuestro sistema carcelario, viabilizado por la Ley de Mandato Constitucional de Rehabilitación, supra. La consecuencia inevitable de este razonamiento es la eventual declaración de inconstitucionalidad de la custodia máxima, como elemento carcelario contrario al concepto de rehabilitación que hoy definimos. Con esto, condenamos a nuestra sociedad a perder otra herramienta disuasiva contra los criminales.

IV

Por los fundamentos expuestos, disiento respetuosamente de la Opinión mayoritaria, y revocaría al Tribunal de Apelaciones.


RAFAEL L. MARTÍNEZ TORRES
                              Juez Asociado